UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 3:12-00222 |
| | ) | JUDGE CAMPBELL |
| MARCELLUS ANTONIO HARRIS | ) | |

MEMORANDUM AND ORDER

I. Introduction

Pending before the Court is Defendant Harris's Motion To Suppress Evidence Obtained From Law Enforcement's Illegal Entry Into 200 Paragon Mills Road, Apartment D-20 (Docket No. 48). The Court held an evidentiary hearing on April 1 and April 8, 2014, and the Defendant has filed a post-hearing brief (Docket No. 77). For the reasons stated herein, the Motion To Suppress (Docket No. 48) is DENIED.

II. Factual and Procedural Background

Through his Motion To Suppress, the Defendant makes two arguments: (1) that the entry of law enforcement officers into his apartment at 200 Paragon Mills Road to effectuate his arrest on May 30, 2012 was an illegal pretext, and the arrest should have occurred prior to the entry; and (2) that the officers lacked a reasonable basis to conduct a protective sweep of the apartment after entry. When the information obtained as a result of these unlawful actions is excised from the search warrant affidavit, Defendant argues, the search warrant is no longer supported by probable cause, and the items seized on the day of his arrest should be suppressed.

Detective Christopher Lo testified at the hearing that in May, 2012, he was told by a confidential informant ("CI") that "Cellus," the Defendant, was selling pills and crack out of an apartment located off Paragon Mills, and that she thought the Defendant was a gang member.

According to Detective Lo, the CI also said that the Defendant lived in "D" building, though she could not recall the apartment number, and that the Defendant had a surveillance system installed at the apartment. The CI also indicated that the Defendant lived in the apartment with his girlfriend, and that they drove a maroon SUV and a maroon Nissan sedan. Detective Lo testified that he viewed the Defendant's criminal history, and learned that the Defendant had several outstanding warrants, including a failure to appear, an arrest for evading, and drug-related convictions and arrest.

On May 21, 2012, Detective Lo testified, the CI completed a controlled buy of crack cocaine from the Defendant at his apartment. After the transaction, Detective Lo determined the specific apartment number where the Defendant lived.

Detective Lo testified that, on May 30, 2012, the CI called the Defendant to set up another controlled buy. According to Detective Lo, the goal was to conduct the drug transaction then to arrest the Defendant on the outstanding arrest warrants. Detective Lo testified that they were not seeking to build a big drug case on the Defendant. Detective Lo testified that the CI was not told that the drug transaction had to take place in any particular location, but to follow the lead of the Defendant. Detective Lo testified that the CI was not told that the officers planned to arrest the Defendant that day.

Detective Lo testified that several officers were involved in the operation, and dressed in marked raid gear to take the Defendant into custody at the appropriate time. Detective Lo testified that his role was to assist in conducting surveillance from a parking area near the apartment. Although he had a radio receiver for the wire worn by the CI, Detective Lo testified, at some point, the audio transmission became inaudible. According to Detective Lo, other

officers advised him that the CI had gone into the apartment, and at some point, he was advised of the decision to move in and knock on the apartment door. Detective Lo testified that as the officers moved toward the apartment, the Defendant's girlfriend, Shatika Cannon, moved to the bottom of the stairway up to the apartment, and screamed out to warn the Defendant that the police were there and not to come to the door. At that point, Detective Lo testified, their position and presence had been compromised, and they knew they had an informant inside and outstanding arrest warrants, so another detective knocked on the door and announced their presence, and they made entry.

Detective Lo testified that the Defendant and the CI appeared to be in the middle of a drug deal. Detective Lo testified that he took the CI into custody, and other officers took the Defendant into custody. As they did so, according to Detective Lo, a baggie containing Xanax bars and crack cocaine fell to the floor from the Defendant's pants. Officers then moved down the hallway to do a sweep of the apartment, Detective Lo testified, to make sure there was no one else posing a threat inside the apartment. Detective Lo testified that during that sweep, there was an accidental discharge from one of the officer's guns in one of the bedrooms. As part of the sweep, Detective Lo testified that he looked in the front closet and saw a $20 bill and the butt of a pistol in plain view. Detective Lo could not recall whether he opened the closet door during the sweep, or whether it was already open. According to Detective Lo, he did not move anything in the closet.

When asked why the officers did not take the Defendant into custody outside the apartment, Detective Lo testified that it was not his decision where to take the Defendant into custody. Detective Lo also testified that when he arrived at the apartment complex, he did not

3

see the Defendant outside, but he heard from the other officers on the radio that the Defendant was outside with a woman later identified as Ms. Cannon, his girlfriend, and some children. Detective Lo estimated that approximately five minutes passed between the time he arrived in the parking lot, and the time he was told to move in for the arrest.

The CI testified that she began working as a confidential informant for Detective Lo as the result of an arrest, but could not recall when that occurred. At that time, according to the CI, she was addicted to heroin and crack cocaine. At some point, the CI testified, at the request of Detective Lo, she attempted to make controlled buys from the Defendant. According to the CI, she eventually completed a purchase of crack from the Defendant using $40 supplied by the police, while carrying a recording device in her purse. On the day of the Defendant's arrest, the CI testified, a detective later identified as Daniel Bowling, worked with her in setting up another controlled buy with the Defendant. The CI testified that she was given $60 of buy money, and was supposed to purchase either Xanax or crack. The CI testified that she was not told by police what to do once inside the apartment, and was not told to distract the Defendants from his surveillance cameras once inside the apartment. The CI testified that she was not told to make the buy inside the apartment.

When she arrived, the CI testified, she spoke with the Defendant and Ms. Cannon, his girlfriend, outside the apartment, and then she went upstairs with the Defendant to his apartment. A very short time thereafter, the CI testified, the police broke down the door and told them to get on the ground. After she was handcuffed, the CI recalls hearing a gunshot, and was later taken outside and allowed to go home.

Sergeant David Humes testified that he was the acting supervisor on the day of the

Defendant's arrest, and became involved when Detective Bowling told him that the Defendant had outstanding warrants that he wanted to serve on him and that a CI knew where the Defendant was located. According to Sgt. Humes, Detective Bowling said that the Defendant had run from police in the past. Sgt Humes testified that the goal of the operation was to serve the Defendant with the warrants, not to arrest him for any drug deal with the CI. Sgt. Humes testified that Detective Bowling told him that the role of the CI would be to keep the Defendant's attention by conducting a drug deal, noting that the Defendant had surveillance cameras.

Sgt. Humes testified that he arrived at the Defendant's apartment complex with Detective Lo and Detective Anthony Heil, and that they parked in a location out of view of the Defendant's cameras. Sgt. Humes testified that he saw the Defendant outside the apartment building 10 to 20 minutes before the CI arrived followed in a separate vehicle by Detective Bowling. Given his vantage point, Sgt. Humes testified, Detective Bowling was "our eyes and ears." Sgt. Humes testified that 45 seconds to one minute and 15 seconds passed between the time the CI arrived and he heard from Detective Bowling that the Defendant and the CI had gone inside. At that point, Sgt. Humes advised the other officers to start moving in. Before they were able to knock on the door, Sgt. Humes testified, a lady at the bottom of the stairs started screaming to the Defendant that the police were there and not to open the door. According to Sgt. Humes, at that point, Detective Heil was knocking on the door, announcing "police" and "warrant." Sgt. Humes testified that he heard someone bump into a table, knocking things over, and that he then ordered the officers to open the door.

Sgt. Humes testified that upon entry, he and Detective Lo took the Defendant into custody. As officers began to move down the hall to clear the apartment, Sgt. Humes testified,

5

Detective Heil's gun went off. At that point, Sgt. Humes explained, his attention was directed to administrative duties relating to the investigation of the accidental discharge. Sgt. Humes testified that the pistol in the front closet was observed within three to four minutes after entry into the apartment. According to Sgt. Humes, the closet door was closed and they opened it during the protective sweep.

Sgt. Humes testified that officers did not arrest the Defendant outside because "[h]e's a runner," noting the Defendant's athletic build. Sgt. Humes testified that he does not believe he could have caught the Defendant if he ran. Sgt. Humes also pointed out that the officers were wearing approximately 35 pounds of equipment.

Detective Bowling testified that he became involved in the investigation of the Defendant a few weeks before the arrest when he received information about the Defendant provided by a CI. Detective Bowling testified that, on May 30, 2012, the plan was to take the Defendant into custody by setting up a narcotics deal with him using the CI. According to Detective Bowling, this would allow the police to confirm that the Defendant was in his apartment before they attempted to arrest him. Detective Bowling testified that the CI was not given any instructions on whether or not to go into the apartment, and does not recall giving her any instructions about the Defendant's surveillance cameras.

When he arrived at the apartment complex, Detective Bowling testified, he observed the CI make contact with the Defendant outside the apartment, at the bottom of the steps, and then walk up the steps with the Defendant into the apartment. Detective Bowling testified that, at that point, he advised the other officers that the Defendant was inside the apartment, and directed them to "stack up" at the door to take him into custody. According to Detective Bowling, they

intended to wait for the CI to walk out of the apartment before taking the Defendant into custody because he would have been in an upstairs apartment with nowhere to go. Detective Bowling testified that he had no information that there were drugs in the apartment, but thought there might be because the Defendant was a drug dealer.

Upon entry, Detective Bowling testified, they took the Defendant into custody, and a bag of pills and some crack feel out of his shorts. Detective Bowling testified that, along with Detective Heil and Officer Gray, they lined up in a stack and went down the hallway to clear the apartment. When Detective Heil went into the first bedroom, Detective Bowling testified, his firearm accidentally discharged. After securing the rest of the apartment, the officers started notifying other officers about the accidental discharge, and Detective Bowling testified that he left to obtain a search warrant for the apartment.

Detective Bowling testified that he did not reveal the existence of the CI in a state court preliminary hearing regarding the Defendant's arrest because he wanted to protect her.

### III. Analysis

A. Illegal Entry

The general rule is that, in order to enter a residence to execute an arrest warrant, officers must either have probable cause or a reason to believe the suspect is within the residence. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); United States v. Hardin, 539 F.3d 404, 416 (6th Cir. 2008). The officers clearly had probable cause to believe the Defendant was in the residence in this case, and the Defendant does not argue otherwise.

Rather, the Defendant argues that the officers violated the Fourth Amendment when they

entered his apartment to effectuate his arrest, primarily relying on the decision of the D.C. Circuit in McKnight v. United States, 183 F.2d 977, 978 (D.C. Cir. 1950). In McKnight, the court held that evidence seized by police should have been suppressed where officers "planned to and did reject a convenient present opportunity to make a lawful arrest in a public street and, without a search warrant or enough information to get one, broke into a house in order to seize evidence they hoped to find there." Id.

The Defendant also cites an opinion of the Tenth Circuit in United States v. Drake, 655 F.2d 1025 (10th Cir. 1981) where the court cited McKnight and other cases in explaining that:

> There is no requirement that an arrest warrant be executed immediately after its issuance; rather, the general rule is that, while execution should not be unreasonably delayed, law enforcement officers have a reasonable time in which to execute a warrant and need not arrest at the first opportunity. . . Delay has been held fatal, however, when government agents have purposely delayed execution to gain a tactical advantage not otherwise attainable for example, to search 'incident to arrest' premises for which a warrant was unobtainable. McKnight v. United States, 183 F.2d 977 (D.C. Cir. 1950).

655 F.2d at 1027 (citations omitted). The court went on to find, however, that the agents in that case acted appropriately in delaying service of the arrest warrant in order to strengthen their case and to obtain peaceful possession of contraband (exotic birds) seen in plain view.

The Defendant has not cited any Sixth Circuit authority applying the McKnight "pretext" holding. In cases cited by the Government, the Eleventh Circuit has held that officers acted lawfully in delaying the execution of an arrest warrant for failure to pay child support in hopes of arresting the defendant while he was committing a drug-related offense. United States v. Jones 377 F.3d 1313 (11th Cir. 2004). In addition, the Eighth Circuit has held that officers acted lawfully when they entered a defendant's home with the dual intention of serving him with an arrest warrant and investigating an anonymous tip regarding drug activity. United States v.

Clayton, 210 F.3d 841 (8th Cir. 2000).

Even if the Court assumes that the McKnight holding would be applied by the Sixth Circuit, however, the Defendant has failed to demonstrate that the factual scenario in this case meets the requirements of that holding. First, the CI testified that she was not told to lure the Defendant into his apartment, or to distract him from his surveillance cameras.[1] In addition, the Defendant has not shown that the officers rejected a "convenient present opportunity" to arrest the Defendant outside his residence. When officers arrived at the apartment complex, there is no dispute that the Defendant was outside with his girlfriend and some children. The Defendant has not shown that those circumstances presented "a convenient present opportunity" for officers to arrest him given the possibility of harm to third parties. In any event, the testimony indicates that any plan to arrest the Defendant inside the apartment was more an effort to prevent the Defendant from fleeing given his prior charge of evading arrest and the presence of surveillance cameras than to "seize evidence they hoped to find" in the apartment. Accordingly, the Court is not persuaded that the Defendant has demonstrated a Fourth Amendment violation regarding the entry into his apartment to effectuate the arrest warrant.

B. Illegal Protective Sweep

In Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Supreme Court considered the practice of conducting a protective sweep of an area to ensure police officer safety when arresting suspects. As described in Buie, "[a] 'protective sweep' is a

---

[1] Defendant also suggests that the CI was a government agent used to circumvent his right to counsel on pending charges in violation of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Massiah held that a defendant's incriminating statements obtained in violation of his Sixth Amendment right to counsel should be suppressed. Massiah does not apply here as the Defendant does not seek to suppress incriminating statements made to the CI.

quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." 110 S.Ct. at 1094. It permits officers "as a precautionary matter and without probable cause or reasonable suspicion," to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id., at 1098. It is not a full search, "but may extend only to a cursory inspection of those spaces where a person may be found" and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id., at 1099. To justify a protective sweep, officers must show that there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. See also United States v. Taylor, 666 F.3d 406, 409 (6th Cir. 2012).

The Defendant argues that the protective sweep in this case was illegal because officers knew that no one else was in the apartment given their surveillance prior to the entry. The testimony of the officers indicates, however, that even though they had not seen anyone enter the apartment, they had not conducted extended surveillance of the residence prior to entry. It was not unreasonable for officers to conduct the sweep to determine that no one was hiding in the rooms and closed closets in the small apartment when they arrested the Defendant, especially given their knowledge that the Defendant conducted drug sales in the apartment and used surveillance cameras. As the Sixth Circuit has pointed out, executing a warrant in a home used in a narcotics conspiracy "may give rise to sudden violence." Taylor, 666 F.3d at 410. Furthermore, the testimony indicates that the sweep was both quick and limited; Sgt. Humes

testified that the firearm in the front closet was observed in plain view within three to four minutes after entry into the apartment. Including that information in the affidavit supporting the request for the search warrant affidavit was appropriate.[2]

IV. Conclusion

For the reasons set forth herein, the Defendant's Motion To Suppress (Docket No. 48) is DENIED.

It is so ORDERED.

                                                              TODD J. CAMPBELL
                                                             UNITED STATES DISTRICT JUDGE

---

[2] The Court notes that the crack cocaine and Xanax bars mentioned in the search warrant affidavit were observed in plain view when they fell from the Defendant's person, and not as a result of the protective sweep.